**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Baltimore Division)**

| | | |
|---|---|---|
| **MITSUKO MAEDA** | * | |
| **3-8-16 Hatahara-Dori** | | |
| **Nada-Ku, Kobe** | * | |
| **Hyogo** | | |
| **657-0822** | * | |
| **Japan** | | |
| | * | |
| **Petitioner,** | | |
| | * | **Civil No.:** |
| **v.** | | |
| | * | |
| **TOMMY KWOKWING WONG** | | |
| **612 Cedarday Drive** | * | |
| **Bel Air, Maryland 21015** | | |
| | * | |
| **Respondent.** | | |
| | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**VERIFIED PETITION FOR RETURN OF CHILDREN TO JAPAN
AND ISSUANCE OF SHOW CAUSE ORDER**

**The Convention on the Civil Aspects of International Child Abduction, done at The Hague on October 25, 1980; International Child Abduction Remedies Act, 22 U.S.C. 9001 *et seq*.**

## INTRODUCTION

1.      Petitioner, Mitsuko Maeda (the "Mother"), by and through her undersigned attorneys, files this Verified Petition for Return of Children to Japan (hereinafter "Petition"), against the Respondent, Tommy Kwokwing Wong (the "Father").

2.      This Petition is filed as a result of the Father's wrongful retention in the United States of the parties' son T.M., born in 2009, and the parties' daughter H.M., born in 2011 (collectively the "children").

3.      The Father has retained the children from the children's proper custody and habitual residence jurisdiction of Japan. The retention began on or about June 22, 2019.

4.      This Petition is brought pursuant to The Convention on the Civil Aspects of International Child Abduction, done at the Hague on October 25, 1980[1] (hereinafter the "Hague Convention" or "Convention") and the International Child Abduction Remedies Act[2] (hereinafter "ICARA").

5.      The Convention came into effect in the United States of America on July 1, 1988, and was ratified between the United States of America and Japan on April 1, 2014.[3]

6.      The objects of the Convention are as follows: (1) to secure the immediate return of children wrongfully removed or wrongfully retained in any Contracting State; and (2) to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in other Contracting States. Convention, art. 1.

### JURISDICTION

7.      This Court has jurisdiction under ICARA § 9003 because this case involves the wrongful retention of two children under the age of sixteen in the United States from the children's habitual residence of Japan, and the children are currently located within the jurisdiction of this Court in Harford County in the District of Maryland.

### FACTS

8.      The Mother is a Japanese citizen. The Mother speaks Japanese. She is somewhat fluent in English.

---

[1]T.I.A.S. No. 11,670 at 1, 22514 U.N.T.S. at 98, *reprinted in* 51 Fed. Reg. 10,493 (1986), text available at: https://www.hcch.net/en/instruments/conventions/specialised-sections/child-abduction (last accessed August 20, 2019).
[2] 22 U.S.C. 9001 *et seq.* (2015).
[3] *See* Hague Convention Country List, at: https://travel.state.gov/content/childabduction/en/country/hague-party-countries.html (last accessed August 20, 2019).

9.      The Father is a Chinese and United States citizen. The Father is fluent in Chinese and English.

10.     The Father obtained United States citizenship through his marriage to a United States citizen, whom he later divorced. The Father has two adult daughters and one adult son from his prior marriage. The Father is estranged from his two adult daughters.

11.     Since 1995 the Father had been employed by the United States Army.

12.     The parties met in 2006 in Hong Kong where the Mother was completing her doctorate degree and where the Father was visiting during his station in Japan.

13.     The parties married on May 14, 2007 in Japan.

14.     The parties agreed at the outset of their marriage that they would live in Japan.

15.     The Mother, as her family's eldest daughter, undertook the role of caring for her elderly parents who live in Kobe, Japan.

16.     Since 2007 the Mother has been employed as a Professor of International and Comparative Education at Osaka Jogakuin University in Japan.

17.     From 2005 until December 2017, the Father worked at the United States Army International Technology Center-Pacific Asian Research Office in Tokyo, Japan.

18.     As a result of the parties' respective employments and pursuant to their agreement, the Mother resided in Kobe, Japan and the Father resided in Tokyo, Japan. The parties purchased in the Mother's name a condominium in Tokyo for the Father's residence. The Mother resided with her parents in Kobe.

19.     The parties traveled back and forth between Kobe and Tokyo to spend time together. The commute was approximately five hours by train.

20.     The parties' son T.M. was born in November 2009 in Kobe, Japan.

21.     After the birth of T.M., the Mother could no longer commute back and forth between Kobe and Tokyo. The Father therefore commuted to Kobe to spend time with the family approximately one or two times per month.

22.     The Mother took one year of maternity leave from her employment. After T.M. turned one year old, he began attending daycare in Kobe.

23.     The parties' daughter H.M. was born in January 2011 in Japan.

24.     The Mother again took one year of maternity leave from her employment. After H.M. turned one year old, she began attending the same daycare as her brother in Kobe.

25.     The parties and children are each named on the Mother's family register in Japan.

26.     The children have dual citizenship in Japan and the United States by virtue of their parents' nationalities.

27.     The children's first language is Japanese.

28.     After the children were born, the parties continued to reside separately. The children have always resided with the Mother by agreement of the parties.

29.     The Mother has always been the primary parent involved in the children's daily upbringing, education, medical treatment, and care.

30.     The children have always been fully involved and integrated in all aspects of daily and cultural life in Japan. The children live in Japan with the Mother and have very close relationships with their extended family in Japan where the Mother's family resides.

31.     The children have attended daycare and then elementary school in Japan for nearly all of their lives. They have a pediatrician in Japan, Japanese passports, attend various extracurricular activities in Japan, and have many friends in Japan. The children are very integrated in Japan and are well liked by their peers and teachers.

32.     Throughout the marriage, the Father told the Mother that as part of his position with the United States Army, at some point in time it was inevitable that he would be transferred to the United States for a fixed period of time. The parties' discussions during their marriage about this potential temporary transfer order never led to any agreement for the Mother and children to relocate with the Father to the United States.  The children are of Japanese heritage, their native language is Japanese, and the parties agreed from the outset of their children's births that the Mother and children would never live anywhere other than Japan.

33.     In April 2017, when the children were seven and six years old, the Mother's University in Japan offered her a one-year sabbatical opportunity. The Mother considered a sabbatical in Hong Kong where the children could learn Chinese and their Father's heritage. The Mother liked the idea of Hong Kong for the sabbatical period because it was close enough to Japan to allow her to frequently return to visit her elderly mother in Kobe, who lives in a nursing home.

34.     While the parties were discussing the Hong Kong sabbatical opportunity, the Father told the Mother in August 2017 that he had received unexpected military orders to transfer from Japan to the United States.

35.     The Father received his orders to Aberdeen Proving Ground in Maryland to begin in January 2018.

36.     The Father could have retired from the United States military at any time because he has completed over twenty years of service. The parties' discussed and agreed that the Father would continue in the army at least until he could return home to Japan or until the Father located post-retirement employment in Japan.

37.     The Father told the Mother that if he accepted the order to transfer to the United States for a period of no more than two years then he would be able to return to Japan after that period.

38.     The Father also told the Mother that if he refused the temporary assignment to the United States then he would be forced to retire from the military.

39.     On August 9, 2017, the Father wrote to the Mother and told her that he had accepted the offer to transfer to Aberdeen Proving Ground and that he had come to the conclusion that this temporary period in the United States would be best for the family.

40.     The parties discussed how long the Mother and the children would temporarily reside in Maryland during the Father's two-year assignment.

41.     The parties discussed and agreed that a temporary stay in the United States would benefit the family and provide the opportunity for the children to learn English, just as the Hong Kong opportunity would have provided the children an opportunity to learn another language and culture.

42.     The Father told the Mother that she could return to Japan as frequently as practical during this temporary stay in the United States.

43.     The Mother was excited about the opportunity to stay in the United States temporarily, to serve as a visiting professor at a university in the United States, and for the children to learn English and western culture during the period of the Father's temporary military assignment in the United States.

44.     The parties agreed that a limited duration, two-year maximum temporary stay in Maryland was feasible for their family, particularly given that the children were young and enrolled in elementary school and would be back home in Japan to complete elementary school

there and begin secondary school. The parties agreed that a two-year maximum period in the United States would facilitate a smooth reintegration once the children returned to Japan.

45.     The parties agreed that the Mother and children would return home to live in Japan after a maximum of two years in the United States, regardless of whether or not the Father chose to stay longer than the agreed temporary period in the United States.

46.     From August 2017 through December 2017, the Father searched for a home in Maryland, located visiting professorship opportunities for the Mother, and attempted to obtain immigration status for the Mother to travel to the United States.

47.     On November 7, 2017, the Father traveled to Maryland to begin searching for a home near the Aberdeen Proving Ground. The Mother desired a home that was near other Japanese families and where she would not need to drive to any visiting professorship that she may undertake for her university sabbatical during the temporary stay.

48.     The Father returned home to Japan in early December 2017.

49.     In furtherance of the parties' temporary stay in Maryland, in August 2017 the Mother began applying for visiting professor positions at universities near the potential residence in Maryland.

50.     The Mother did not have any success with her visiting professor applications.

51.     The Father therefore told the Mother that she should put on her applications that she is married to a United States citizen and a United States military officer and that she is applying for a green card.

52.     The Father told the Mother that she would be able to obtain a "green card" for her to stay in the United States because she is the spouse of an army military officer. In October

2017, the Father therefore submitted his I-130 Petition for Alien Relative application for the Mother to obtain a green card. The Mother's green card was later approved on March 27, 2018.

53.     The Mother finally received an offer in October 2017 and accepted a one-year visiting professorship – in line with her one-year sabbatical from her university in Japan – at the University of Pennsylvania.

54.     The Mother's University in Japan granted the Mother permission to take a short-term sabbatical from her professorship position and approved the temporary sabbatical from April 2018 until March 2019.

55.     On December 21, 2017, the Father traveled to Maryland to begin his military orders starting from January 2018.

56.     The parties discussed and considered the best timing for the children to transfer into an English-speaking elementary school because the children's first language is Japanese and they did not speak English well. The parties concluded that it would be better for the children to begin in January 2018 after the winter school break rather than traveling with the Mother at the conclusion of her university semester in April 2018 with only two months left in the elementary school year in Maryland.

57.     The Mother and children therefore traveled on December 26, 2017 and met the Father who was already in Maryland. The Mother remained in Maryland with the children during her university winter break and returned home to Japan on January 15, 2018.

58.     The children enrolled in Homestead Wakefield Elementary School in Bel Air.

59.     The Father located an isolated residence in Bel Air, Maryland, ignoring the Mother's needs during this temporary stay. The located residence required the Mother to drive herself to utilize any public transportation, which she could not do. The Father accepted a

contract to purchase the residence on or about December 23, 2017, which was recorded in his name on or about January 4, 2018.

60.     On March 27, 2018, the Mother traveled to Maryland to begin her one-year temporary sabbatical with the University of Pennsylvania.

61.     During the temporary sabbatical in Maryland, the Mother travelled back home to Japan twice in June 2018 and November 2018 for her university employment in Japan and to visit friends and family. On each occasion, the children did not travel with the Mother because they were enrolled in school and the Father reasoned that frequent travel to Japan was not necessary because the children were returning home to Japan after the temporary two-year maximum stay in the United States.

62.     Prior to living together with the Father in Maryland, the parties had never lived together as a family unit. The Mother was aware of the abusive nature of the Father but it escalated after they started living together every day.

63.     The Father immediately began constantly verbally abusing the Mother.

64.     Due to the Father choosing a home in an isolated area, the Mother relied almost exclusively on the Father for her daily transportation and for developing any sort of relationship with the United States culture.

65.     The Mother was also aware of the Father's obsessive-compulsive behavior, which escalated after the Mother and children began living together with the Father. While residing separately in Japan, the Father often scolded the Mother for allowing the children to develop friendship or to invite their friends to their home in Japan, saying that the children may get "dirty". On one occasion when the children invited a Vietnamese friend to visit while in the United States, the Father complained the house had been "contaminated."

66. Due to the Father's phobias, the Father's psychological control over the children began to worsen and the Mother became increasingly concerned about the children's well-being around the Father on a daily basis.

67. On or about September 2018, the Father began raising the possibility of retiring from the military. The parties had always discussed and agreed that if the Father were to retire, the Mother and children would continue to live in Japan when that occurred.

68. In December 2018 the Father retired from the military.

69. The Father then began unilaterally searching for a home in Pennsylvania. The Mother confronted the Father about his efforts to locate another home in a different state when the children were returning home to Japan in less than one year no later than December 2019. The Father ignored the Mother.

70. The Mother's one-year temporary sabbatical ended on March 31, 2019. The Mother therefore returned to Japan on March 25, 2019 to begin the new university semester on April 1, 2019.

71. The Mother planned to return to Maryland from August through September 2019 to continue caring for the children during the summer break from school. The Mother promised the children she would speak to them daily by telephone or video.

72. After the Mother returned home to Japan, the Father immediately began interfering with contact between the Mother and children.

73. In May 2019, the Father contacted the Mother and told her that he had purchased a new home in Pennsylvania.

74.     The Mother took leave from her employment in Japan for ten days to travel to the United States on June 13, 2019 rather than waiting until the summer break in August because of her fear that the Father had plans to cease contact between the Mother and the children.

75.     On June 15, 2019, the Mother confronted the Father about the children's passports. The Father refused to disclose the location of the passports.

76.     The parties continued to argue throughout that night. The Mother suggested that perhaps the parties should separate. The Father immediately reacted with outrage and began screaming at the Mother and shouting abusive language at her. The next day, the Mother sought legal advice.

77.     On June 22, 2019, the day of the Mother's scheduled return home to Japan, the Father asked to speak to the Mother at the home in Bel Air.

78.     During the parties' discussion, the Father for the first time told the Mother that he has unilaterally decided that the children will remain in the United States and will not return to Japan at the conclusion of the two-year maximum temporary stay—thereby repudiating the parties' shared agreement for the children to return to Japan at the conclusion of the temporary two-year maximum period in the United States.

79.     The Father asked the Mother to consent to the children's indefinite stay in the United States. The Mother of course refused. The Mother told the Father that she does not agree and has never agreed for the children to stay in the United States beyond the agreed-upon temporary two-year maximum period. She told the Father that she has never agreed for the children to live permanently or indefinitely anywhere outside of Japan. The Mother made clear to the Father that based on the Father's repudiation of the parties' agreement for the children to

return home to Japan, the Mother no longer agrees for the children to be in the United States, even temporarily.

80.    On July 2, 2019, the Father filed a Complaint for Custody in the Circuit Court for Harford County in Case No. C-12-FM-19-001184. The Mother has not participated in that proceeding and has not been served with the Complaint or 90-day Writ of Summons. According to the public docket, the Father sought and obtained an ex parte temporary order prohibiting the children's removal from the United States until further order.

81.    The Father has now also restricted the Mother's access time with the children. Between the date of the Father filing his state court custody Complaint and the date of filing this Petition, the Mother has not had any in-person access with the children and the Father has only allowed the Mother to communicate to the children via Facetime supervised by him.

82.    The Mother has also now learned that the Father has imminent plans to relocate the children to York County, Pennsylvania before the start of the 2019-2020 school year and, upon information and belief, that he has unilaterally enrolled the children for a full year of school in Pennsylvania, or alternatively, in Maryland.

83.    The parties never had a shared intent for the children to live anywhere other than Japan. The parties' only last shared, settled intent with respect to the children's habitual residence has been that the children will reside in Japan with the Mother.

84.    The children have resided in Japan for all of their lives. The parties agreed to a fixed temporary two-year maximum period for the children to live in the United States and for the children to return to Japan no later than December 2019.

85.    The Mother has never consented for the children living anywhere other than Japan.

12

86.     The Mother has not acquiesced in the Father's wrongful retention of the children in the United States from Japan.

87.     At the time of the Father's wrongful retention of the children on June 22, 2019, the Mother had (and continues to have) rights of custody to the children in Japan, by operation of Japanese law, as fully set forth below.

88.     The Father retained the children in the United States on or about June 22, 2019 when he announced that he is unilaterally retaining the children in the United States and that he refuses to return the children to Japan at the conclusion of the two-year maximum agreed temporary period in December 2019.

89.     The Father is in breach of the Mother's rights of custody as a result of his retention of the children in the United States from the children's habitual residence of Japan.

90.     From the children's birth until the Father's wrongful retention of the children, the Mother has been the children's primary caretaker. The Mother has consistently and without interruption exercised her rights of custody to the children.

91.     The Mother has submitted her Hague Convention Return Application ("Hague Application") to the Japanese Ministry of Foreign Affairs (the Japanese Central Authority), which will then be transmitted to the United States Department of State Office of Children's Issues (the United States Central Authority).

**COUNT I – WRONGFUL RETENTION**

92.     The Mother restates and re-alleges the allegations contained in Paragraphs 1 through 91 as if fully set forth herein.

93.     The Convention applies to cases in which a child under the age of sixteen (16) years has been removed or retained from his or her habitual residence in breach of rights of

custody of a petitioner, which the petitioner had been exercising at the time of the wrongful removal or wrongful retention of the children.

94.     The children in this case are under the age of 16.

95.     The habitual residence of the children is Japan.

96.     The retention of the children in the United States from Japan is wrongful and began on or about June 22, 2019 – the date the Father told the Mother that the children are not returning home to Japan at the end of the two-year maximum temporary period in December 2019. It was then that the Father made the unilateral decision to remain with the children in the United States, thereby repudiating the parties' agreement for the children to return home to Japan at the conclusion of the temporary period in the United States.

97.     During this conversation on June 22, 2019, the Mother learned for the first time the true nature of the family's situation in Maryland – namely, that the Father has unilaterally decided that the children are not returning to Japan and that the Father has repudiated the parties' agreement for the children to return to Japan at the conclusion of the temporary period in the United States.

98.     In response to the Father's statements in the conversation on June 22, 2019, the Mother told the Father that she does not agree, and never has agreed, for the children to stay in the United States beyond the originally agreed-upon temporary two-year maximum period. She told the Father that she has never agreed for the children to live permanently or indefinitely anywhere outside of Japan.

99.     The habitual residence of the children is Japan and was Japan on the date the Father retained the children in the United States.

100.    The children have lived in Japan since their respective births in 2009 and 2011.

101.     The parties have only ever had a shared, settled intent for the children to reside in Japan. They have never had a shared intent for the children to live anywhere other than Japan. The parties agreed for the children to have a temporary two-year maximum period in the United States, at the end of which the children would return to Japan. The parties never agreed for the child to live outside Japan indefinitely or permanently.

102.     At the time of the Father's wrongful retention of the children in the United States from Japan, the Mother had and continues to have rights of custody to the children by operation of law under Japanese law.

103.     Notice is given in this pleading that the Mother is relying upon foreign law. Fed.R.Civ.P. 44.1.

104.     The Civil Code of Japan (the "Civil Code") governs the application of law as it relates to the Mother's rights of custody.

105.     Under Article 818(3) of the Civil Code, parental authority shall be exercised jointly by married parents.

106.     "A person who exercises parental authority holds the right, and bears the duty, to care for and educate the child for the child's interests." Japanese Civil Code, Art. 820.

107.     "Residence of a child shall be determined by a person who exercises parental authority." Japanese Civil Code, Art. 821.

108.     The rights and responsibilities of a person entitled to parental authority under Japanese law necessarily involve the "care of the child" and is therefore a right of custody under Article 5*a* of the Hague Convention.

109.    The Mother here, as the holder of joint parental authority over the children, never agreed for the Father to retain the children in the United States permanently or indefinitely. She never agreed for the children to be kept outside Japan after December 2019.

110.    The Mother has these rights by operation of law even without any orders being entered relating to the children by any Japanese courts, and she had these rights at the time the Father announced his unilateral retention of the children in the United States.

111.    The Father's retention of the children in the United States is therefore in breach of the Mother's rights of custody under Japanese law and is wrongful.

112.    At the time the Father wrongfully retained the children in the United States from Japan, the Mother was exercising her custody rights within the meaning of Articles 3 and 5*a* of the Convention by caring for the children, fully participating in the children's lives, and undertaking all parental responsibilities since the children were born.

113.    The Father's wrongful retention of the children in the United States from Japan is wrongful under the Hague Convention because the Father has retained the children in the United States from the habitual residence of Japan, in breach of the Mother's rights of custody to the child under Japanese law, which the Mother was exercising at the time of the retention (or would have been exercising but for the Father's wrongful retention).

114.    The Mother has promptly taken all legal steps available to her to seek the return of the children to Japan in accordance with the Hague Convention.

115.    The Mother has never acquiesced or consented to the retention of the children in the United States from Japan.

116.    The children are currently physically located within the District of Maryland (Baltimore Division) at 612 Cedarday Drive, Bel Air, Maryland 21014.

### COUNT II – ARTICLE 18 RETURN

117.     The Mother restates and re-alleges the allegations contained in Paragraphs 1 through 116 as if fully set forth herein.

118.     The Mother invokes Article 18 of the Convention, which grants this Court plenary power to order the children's return at any time.

119.     In accordance with the Article 18 equitable return factors set forth in Justice Alito's concurring opinion in *Lozano v. Montoya Alvarez*, the Mother requests that this Court exercise its equitable discretion to return the children to Japan under Article 18 even if the Father establishes one of the Convention's five narrow discretionary exceptions to return under the Convention.[4]

120.     The children here have an interest in returning to Japan, their country of habitual residence.

121.     The children have close ties with Japan; in particular, they have close ties to: (a) the Mother; (b) their nuclear and extended families; (c) their daycare and school; (d) their medical care; and (e) their Japanese culture.

122.     The children have a strong need for regular daily contact with the Mother, who was exercising rights of custody at the time the children were retained in the United States from Japan and who was and has always been the children's primary caretaker. The Father is now preventing all meaningful contact between the children and the Mother.

123.     The Mother has an interest in exercising her Japanese rights of custody in Japan, which she was doing at the time the Father retained the children in the United States.

---

[4] *See Lozano*, 134 S.Ct. at 1237 (Alito, J., concurring) (listing factors that weigh in favor of returning a child to the country of habitual residence even when a narrow discretionary exception to return is established).

124. The governments of Japan and the United States both have an interest in discouraging inequitable conduct and deterring international child abductions.

**PROVISIONAL AND EMERGENCY REMEDIES[5]**

125. Simultaneously with the filing of this Petition, the Mother files a Request to Expedite Proceedings and Issue Show Cause Order in Lieu of Writ of Summons Pursuant to Hague Convention Law.

126. The Mother requests that this Court issue a Show Cause Order in lieu of a writ of summons due to the expedited nature of this child abduction case and pursuant to the Hague Convention, the mandate of the United States Supreme Court, the implementing statute and relevant Fourth Circuit authority.

127. The Father is wrongfully retaining the children in the United States.

128. The Father is imminently moving the children to Pennsylvania. Upon information and belief, the Father unilaterally purchased a home located at 300 South Shaffer Drive, New Freedom, Pennsylvania 17349. The Father has unilaterally announced that he is keeping the children in the United States from their home in Japan. The "move" to Pennsylvania is scheduled to occur before the start of the 2019-2020 school-year.

129. The Father has the resources and the ability to remove the children to a different state outside of this Court's jurisdiction. And the Father is scheduled to imminently and unilaterally relocate the children this month to Pennsylvania where this Court would no longer have jurisdiction over this child abduction case.

---

[5] This Court "[i]n furtherance of the objectives of . . . the Convention . . . may take or cause to be taken measures under Federal or State law, as appropriate, to protect the well-being of the child involved or to prevent the further removal or concealment before the final disposition of the petition." ICARA § 9004.

130.    The children's second-term of school in Japan is scheduled to begin on September 1, 2019. The children will likely now miss the start of their second-term in Japan.

131.    Unless this Court takes immediate action to issue a Show Cause Order, and then bring the Father and the children before the Court, irreparable harm will occur to the well-being of the children in that children will be deprived of their Mother, their home, and their life in Japan.

132.    The Mother therefore requests that the Court issue a Show Cause Order forthwith ordering the appearance of the Father and children before this Court on the first available date on the Court's calendar, and directing the United States Marshal to serve the Show Cause Order on the Father forthwith. The Court will then be able to confirm the exact whereabouts of the children in Maryland as required by ICARA § 9003(b).

133.    In the alternative, the Mother requests that the Show Cause Order and all other pleadings and papers filed in this case be served by private process on the Father's Maryland state court counsel, Stephen J. King, Esquire, Stephen Jennings King, P.A., 44 North Main Street, Bel Air, Maryland 21014.

134.    Pursuant to ICARA § 9004, in a proceeding for the return of a child, "[n]o court exercising jurisdiction … may … order a child removed from a person having physical control of the child unless the applicable requirements of State law are satisfied."  ICARA § 9004.  In this case, the law referred to is that of Maryland.

135.    In Maryland, the Uniform Child Custody Jurisdiction and Enforcement Act (hereinafter "UCCJEA") is the source for statutory law governing, *inter alia*, the resolution of both domestic and international child custody disputes and is codified as MD. CODE ANN., FAMILY LAW, §§ 9.5-101 *et seq.*

136.     Maryland law addresses the appearance of the parties and the child in such cases in § 9.5-210 of the UCCJEA.  That section authorizes this Court to order the appearance of the child and custodian or custodians *together*.  *Id.*  This Court therefore has the authority to issue a show cause order, ordering the appearance of the Father and children in that the provisions of 22 U.S.C. § 9004 can be met.

137.     The Mother further requests that this Court order, as a part of the Show Cause Order, a provision prohibiting either party from removing the children from the jurisdiction of this Court during the pendency of the proceedings in this Court, taking into possession all of the children's travel documents, and thereafter issuing a Scheduling Order setting an expedited hearing on the Verified Petition for Return of Children to Japan.

138.     The Mother may not be financially able to travel to the United States for both the Show Cause hearing and the final evidentiary hearing in this case. The Mother requests that her appearance be excused for the initial Show Cause hearing or that she be permitted to appear by telephone. The Mother's counsel will appear on her behalf at the Show Cause Hearing, and will have full authority to schedule all further hearings and deadlines in this case. The Mother intends to travel to the United States to appear for the evidentiary hearing.

139.     In accordance with the Hague Convention Articles 2 and 11, ICARA, 28 U.S.C. § 1657, the requirement of the Supreme Court of the United States that courts use the most expeditious procedures available, and the good and meritorious cause to expedite consideration of the Mother's Petition, this Court should enter a Show Cause Order forthwith in the form submitted to this Court, setting a date for the Father to appear with the children, on the first date available on the Court's calendar, and thereafter allowing for full resolution of this matter within six weeks of the date of filing this Petition.

## UCCJEA DECLARATION

140.    The details regarding the minor child that are required to be provided under the UCCJEA are as follows:

a    The children have been physically located at the following address, with the Father, from on or about December 26, 2017 until June 22, 2019, and from June 22, 2019 to present as a result of the Father's wrongful retention of the children: 612 Cedarday Drive, Bel Air, Maryland 21015.

b    For the five years preceding this Petition until December 26, 2017, the children resided with the Mother by agreement of the parties at 3-8-16 Hatahara-Dori, Nada-Ku, Kobe, Hyogo, 657-0822, Japan.

c    The Mother does not have information of any custody proceeding concerning the children pending in any other court of this or any other State, except as set forth in this Petition.

d    The Mother does not know of any person, or institution, not a party to the proceedings, which has physical custody of the children or claims to have rights of parental responsibility or legal custody or physical custody of, or visitation or parenting time with the children.

## NOTICE OF HEARING

141.    Pursuant to ICARA § 9003(c), the Father will be given notice of any hearings in accordance with Maryland's UCCJEA.[6]

---

[6] The Convention itself does not specify any specific notice requirements. ICARA provides that notice be given in accordance with the applicable law governing notice in interstate child custody proceedings. ICARA § 9003(c).

## ATTORNEYS' FEES AND COSTS INCLUDING TRANSPORTATION EXPENSES PURSUANT TO CONVENTION ARTICLE 26 AND ICARA § 9007

142.    The Mother has incurred significant expenses as a result of the wrongful retention of the children by the Father. The Mother will submit a copy of all expenditures as soon as practicable and possible and will amend these costs, from time to time, according to proof and in light of further expenditure required because of the Father's wrongful retention.

143.    The Mother respectfully requests that this Court award all reasonable and necessary expenses and attorneys' fees and costs incurred to date as required by ICARA § 9007, reserving jurisdiction over further expenses.

### RELIEF REQUESTED

**WHEREFORE**, Petitioner, Mitsuko Maeda, respectfully requests the following relief:

A. That this Court issue an Order directing the prompt return of the children to their habitual residence of Japan in accordance with Petitioner's rights of custody under Japanese law and Articles 3, 5*a* and 18 of the Convention; and

B. That this Court issue a Show Cause Order forthwith, scheduling an initial show cause and scheduling hearing on the first available date on the Court's calendar, and requiring the Respondent to appear in person with the children at the show cause and scheduling hearing to confirm that the children are physically located within this Court's jurisdiction;

C. That this Court's Show Cause Order also include a provision ordering that neither party may remove the children from this Court's jurisdiction during the pendency of these proceedings, and taking into the Court's possession all of the children's passports and any other travel documents;

D. That this Court's Show Cause Order be served on the Respondent forthwith by the United States Marshal Service;

E.  In the alternative, that this Court's Show Cause Order be served on the Respondent's Maryland state court counsel, Stephen J. King, Esquire;

F.  That this Court excuse the appearance of the Petitioner at the Show Cause Hearing as long as the Petitioner's counsel appears on her behalf and has full authority from the Petitioner to schedule an expedited evidentiary hearing and all related deadlines;

G.  That this Court order daily and unfettered electronic video and telephone access for the Petitioner with the children during the pendency of these proceedings;

H.  That this Court order unfettered in-person access for the Petitioner with the children while the Petitioner is in Maryland during the pendency of these proceedings;

I.  That if the Respondent fails to appear pursuant to this Court's Show Cause Order, that this Court issue an Order directing that the name of the children be entered into the national police computer system (N.C.I.C.) missing persons section and that an arrest warrant be issued for the Respondent;

J.  That this Court issue an Order directing the Respondent to pay the Petitioner's reasonable and necessary expenses, including but not limited to attorneys' fees, suit money, expenses, and costs; and

K.  That this Court grant any such further relief as justice and the Petitioner's cause may require.

## VERIFICATION

PURSUANT TO 28 U.S.C.A. §1746, I DECLARE UNDER THE PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT. EXECUTED ON AUGUST 20th 2019.

I FURTHER DECLARE UNDER THE PENATLY OF PERJURY THAT THE FOREGOING PETITION FOR RETURN OF CHILDREN TO JAPAN WAS TRANSLATED AND READ TO ME IN JAPANESE BY MY JAPANESE ADVOCATE, KEIKO IMAZATO, WHO SPEAKS, READS, AND WRITES ENGLISH AND JAPANESE FLUENTLY.

Mitsuko Maeda
*Petitioner*

Respectfully submitted this 20th day of August, 2019.

/s/ Leah M. Hauser
Stephen J. Cullen, Bar No.: 11838
Kelly A. Powers, Bar No.: 28567
Leah M. Hauser, Bar No.: 14156
Miles & Stockbridge P.C.
100 Light Street
Baltimore, Maryland 21202
(410) 385-3629
(410) 385-3709 (fax)
scullen@milesstockbridge.com
kpowers@milesstockbridge.com
lhauser@milesstockbridge.com

*Attorneys for Petitioner*

24